MGD

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Dennis Gilbert,

Plaintiff,

v.

La Paz County, et al.,

Defendants.

No.  CV 18-01792-PHX-DGC (DMF)

**ORDER**

I.    **Background**

Plaintiff Dennis Gilbert, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 against La Paz County and multiple County employees.  (Doc. 1.)  Defendants move for summary judgment, and Plaintiff opposes. (Docs. 56, 61.)  The Court will grant the Motion in part and deny it in part.

Plaintiff alleges the following facts in his Complaint.  In August 2017, Plaintiff was incarcerated for a little over a day in the La Paz County Detention Facility (the "Jail") following his arrest.  (Doc. 1.)  Plaintiff has a seizure disorder, is partially paralyzed in his left arm and leg, uses a cane to walk, and has a qualified disability under the Americans with Disabilities Act (ADA).  (*Id.* ¶¶ 7, 81.)  At the Jail, Plaintiff was housed in a non-ADA-compliant cell that had a toilet and shower and was told to shower.  (*Id.* ¶¶ 11, 17, 22, 24.)  Plaintiff fell while getting out of the shower and shattered the bones in his left arm and elbow, requiring surgery.  (*Id.* ¶¶ 28-32, 52-54.)  The charge against Plaintiff was dropped, and Plaintiff was released from the Jail and went to live with his sister.  (*Id.* ¶¶ 55-

56.)  In September 2017, Plaintiff was hospitalized because he became depressed over his diminished physical condition, and in February 2018 he moved to a skilled nursing facility where he will need to remain for the rest of his life.  (*Id.* ¶¶ 57-60.)

In Count One, Plaintiff asserts a Fourteenth Amendment claim under 42 U.S.C. § 1983 against Defendants Detention Officers Redman, Jarramillo, Thompkinson, Conley, McIntosh, Brinkerhoff, Roberts, Fleming, and Ruiz in their individual capacities.[1]  (*Id.* ¶¶ 61-70.)  In Count Two, Plaintiff asserts a *Monell* claim against Defendants La Paz County and La Paz County Sheriff Risen, in both his individual and official capacity.  (*Id.* ¶¶ 71-73.)  In Count Three, Plaintiff asserts an ADA claim against La Paz County, and in Count Four, he asserts a negligence claim against La Paz County.  (*Id.* ¶¶ 79-88.)  Plaintiff seeks damages, attorneys' fees and costs.  (*Id.* at 11-12.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

---

[1] Defendants Thompkinson, McIntosh and Brinkerhoff were later dismissed from this action.  (Doc. 31.)

1   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its
2   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,
3   it must "come forward with specific facts showing that there is a genuine issue for trial."
4   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal
5   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

6          At summary judgment, the judge's function is not to weigh the evidence and
7   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,
8   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw
9   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited
10  materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

11  **III.   Facts**

12         Upon arrival at the Jail and in the booking/intake area, detainees receive a risk
13  assessment by an officer or a nurse.  If it is nighttime and the nurse is not on duty, the
14  screening is performed by the booking officer and the nurse will perform a risk and needs
15  assessment the following day.  (Doc. 57 (Defs.' Statement of Facts (DSOF)) ¶¶ 33-34.)
16  The screening includes an assessment that includes "mobility restrictions and physical
17  handicaps, etc."  (*Id.* ¶ 35.)  At the time of Plaintiff's incarceration, a medical provider
18  would perform a physical examination of new detainees on Fridays to ensure that any
19  medical, dental, or other aids to impairment were provided.  (*Id.* ¶¶ 45-46.)

20         On August 29, 2017, around 9:40 p.m., Plaintiff was arrested and booked into the
21  Jail.  (*Id.* ¶ 69.)  At the time, Plaintiff was 57 years old and had been disabled since suffering
22  a traumatic brain injury in a 1989 motorcycle accident that left him with a seizure disorder
23  and cognitive issues.  (Doc. 62 (Pl.'s Separate Statement of Facts) at 11 ¶ 49.)  In 2013,
24  Plaintiff suffered a series of strokes that weakened the entire left side of his body and
25  partially paralyzed his left arm and leg.  (*Id.* ¶ 50.)  Upon his arrival at the Jail, Plaintiff
26  was not using any walking device or wheelchair.  (Doc. 57 ¶ 70.)  Plaintiff's gait was weak
27  and slow on his left side and Defendants Redman and Jaramillo physically assisted Plaintiff
28  while in the booking room and in the shower room.  (*Id.* ¶ 71.)

Because it was nighttime, the nurses were not on duty and Defendant Redman performed an initial screening of Plaintiff using the Jail's "Risk and Needs Screening" report form.  (*Id.* ¶ 72.)  Redman noted that Plaintiff had a stroke in 2014, that he had "restricted mobility, or a physical handicap," as well as diabetes and seizures or epilepsy.  (*Id.* ¶ 73.)  Jail policy and the booking process required that Plaintiff take a shower, and the shower room in the booking/intake area has "reasonable accommodations" for detainees who may have limited mobility or physical disabilities including industrial-sized, thick rubber mats on the floor, a shower stool/bench, and a walk-in shower.  (*Id.* ¶¶ 36-37, 74.)  Plaintiff was physically escorted in and out of the change-out shower room by Defendant Jaramillo.  (*Id.* ¶ 75.)  Jail staff provided Plaintiff with standard issue non-slip shoes, and after Plaintiff completed the booking and showering process, Jaramillo retrieved a wheelchair to escort Plaintiff to the intake cell.  (*Id.* ¶¶ 76-77.)  Plaintiff was not issued a cane, walker, or wheelchair because of his inability to fully use his left arm and due to security concerns.  (*Id.* ¶ 78.)  "Plaintiff was instructed to tell Jail staff [] if he needed to use the restroom or needed anything else and staff would provide assistance."  (*Id.* ¶ 79.)

Plaintiff had no issues during the first night in the intake cell, and the following morning, Licensed Practical Nurse Jeff Bissell performed a medical screening.  (*Id.* ¶¶ 45, 81.)  Bissell noted Plaintiff's seizures, diabetes, left-side weakness due to stroke, and his restricted mobility and physical handicap.  (Doc. 62 at 9 ¶ 31.)  Afterwards, Nurse Bissell cleared Plaintiff to be housed in the medical unit due to his "left-sided weakness and [] trouble moving around, walking" and seizure condition.  (Doc. 57 ¶¶ 83-84.)  Plaintiff disputes paragraph 83, asserting that Bissell recommended Plaintiff be housed in the medical cells, stating the he instead was placed in the juvenile cell.  (Doc. 62 at 5 ¶ 83.)

Around 6:45 p.m. on August 30, 2017, Defendant Conley moved Plaintiff from the intake cell via a wheelchair into a single jail cell known as the juvenile cell inside the medical dorm because the two medical cells were already occupied and the juvenile cell had bottom-bunk accessibility.  (Doc. 57 ¶¶ 85-86.)  The only other option in the medical dorm was to house Plaintiff in a "boat," which is similar to a long table that sits about six

inches off the ground and has a mattress on top; otherwise, Plaintiff would be housed with the other County detainees.  (*Id.* ¶¶ 88, 90.)  The "boat" was not advisable because of Plaintiff's physical limitations, nor was housing with other County detainees due to Plaintiff's vulnerability.  (*Id.* ¶¶ 89, 91.)  Therefore, Plaintiff was housed in the juvenile cell until he could be examined by a medical provider.  (*Id.* ¶ 91.)  Plaintiff disputes these statements, asserting that "Conley did not act in accordance with Bissell's medical clearance" and that Conley could have moved a detainee from one of the medical cells to the juvenile cell and housed Plaintiff in a medical cell.  (Doc. 62 at 5 ¶¶ 85, 88, 91.)  Conley allowed Plaintiff to have access to the dayroom by leaving two doors open.  (Doc. 57 ¶ 92.)

The juvenile cell has one double-bunk bed with a toilet and a metal shower.  (Doc. 57 ¶ 62.)  The juvenile cell does not have grab bars around the toilet or around the exterior of the metal shower, which has a 27-inch wide opening.  (Doc. 62 at 9 ¶¶ 21, 24.)  The inside of the metal shower has no grab bars, shower seat or rubber mat, and there is a 10-inch shower curb.  (*Id.* ¶¶ 22-23.)  The two medical cells at the Jail have walk-in showers with grab bars.  (*Id.* ¶ 26.)  The 1991 ADA requires showers to be at least 35-inches wide, have a shower seat, grab bars, and a curb no higher than half an inch.  (*Id.* ¶ 28.)

After being placed in the juvenile cell, Plaintiff went to sleep until approximately 11:00 p.m.  (*Id.* ¶ 94.)  Starting at 11:00 p.m., Detention Officers Ruiz and Fleming began locking down all the pods, which means that all televisions are turned off, detainees are required to return to their cells, and lights are turned off.  (*Id.* ¶¶ 95-96.)  Around 11:00 p.m., Fleming did a security check of the medical and juvenile cells.  (*Id.* ¶ 97.)  Plaintiff disputes that "Fleming conducted any checks on plaintiff while in the juvenile cell," asserting that this is not reflected in Defendants' "Officer Location Incident form." (Doc. 62 at 6 ¶ 97.)

After lockdown, Plaintiff awoke and decided to shower.  (Doc. 57 ¶ 98.)  "Plaintiff did not request assistance from jail staff prior to showering or request a stool like the one he used in the shower the day before."  (*Id.* ¶ 99.)  Plaintiff did contact the control tower via intercom after lockdown before he decided to shower.  While Plaintiff was looking for

a light switch, he instead hit the intercom button and a female voice asked him what he needed. (*Id.* ¶¶ 100, 102.) Plaintiff told the female that "he was looking for a light switch so he could shower." (*Id.* ¶ 103.) The officer did not tell Plaintiff he could not take a shower or to wait until an officer came to help him. (Doc. 62 at 12 ¶¶ 58-59.) The officer on the intercom told Plaintiff, "this is not the light switch. It's the intercom." (*Id.* ¶ 60.) Plaintiff apologized to the officer and then took his shower. (*Id.* ¶ 61.)

According to Defendants, there was no female officer in the control tower at that time. Defendant Roberts, a male detention officer, was in the control tower. (Doc. 57 ¶ 104.) Roberts did not have visual contact with Plaintiff, did not know Plaintiff was disabled, and was not told Plaintiff wanted to shower. (*Id.* ¶¶ 105-106.) Plaintiff disputes this statement, stating that he "did inform the Tower officer Roberts that he wanted to take a shower" and "Roberts failed to inform the floor officers." (Doc. 62 at 6 ¶ 108.)

Plaintiff "decided to shower in the middle of the night, after lockdown, without any accommodations and without wearing his non-slip shoes." (Doc. 57 ¶ 109.) When Plaintiff stepped out of the shower, he held onto the edge of the stall. The floor "felt like it was made of ice. Plaintiff's feet slid out from under him, and he fell. He heard his bone snap as he hit [the] floor." (Doc. 62 at 13 ¶ 62.)

Prior to his accident, Plaintiff did not complain about the shower or the cell accommodations. (Doc. 57 ¶ 110.) Plaintiff did not "request a single accommodation or ask for any help from any detention officer" and "admits he requested no assistance/accommodations prior to deciding to shower." (*Id.* ¶ 111.) Plaintiff undressed without assistance, entered the shower, and fell after exiting the shower. (*Id.* ¶¶ 112-113.) After he fell, Plaintiff used the intercom in the cell to request assistance from the Control Tower. (*Id.* ¶ 114.) Around midnight, Officer Roberts received Plaintiff's intercom call and immediately radioed Fleming and Ruiz to tell them Plaintiff had fallen in the cell and needed assistance. (*Id.* ¶ 115.) Fleming and Ruiz responded immediately and assisted Plaintiff by obtaining a wheelchair and bringing him to the intake area to prepare for

transportation to the hospital.  (*Id.* ¶¶ 116-117.)  Ruiz gave Plaintiff a Tylenol for pain.  (*Id.* ¶ 118.)

Officer Roberts transported Plaintiff to the La Paz Regional Hospital in a sheriff's office vehicle that was low to the ground, making it easier for Plaintiff to enter and exit, and Plaintiff was handcuffed in front of his body.  (*Id.* ¶ 124.)  Roberts also accompanied Plaintiff in the ambulance from La Paz Regional Hospital to the Banner hospital in Phoenix.  (*Id.* ¶ 125.)

The Jail does not issue physical handbooks to detainees describing the Jail's rules and regulations, officers do not explain the rules to the detainees, and the Jail's "required ADA orientation consists only of the detention officer telling the inmate he needs to get on the [electronic touch screen] kiosk to get information."  (Doc. 62 at 10 ¶ 41.)  Officers do not explain how to make an ADA claim or request an accommodation and only tell detainees to review the kiosk.  (*Id.* ¶ 43.)  The burden is on detainees to access the kiosk to read and understand the jail rules and the grievance process.  (*Id.* ¶ 44.)  The inmate handbook has no information about the ADA, requesting an accommodation, or grieving an ADA issue.  (*Id.* ¶ 47.)  At the time of Plaintiff's fall, there was no kiosk in the medical area or near the juvenile cell; the nearest kiosk was in the booking area.  (*Id.* ¶ 48.)

Defendant Sheriff Risen took office on January 1, 2017.  At the time of Plaintiff's slip and fall the prior administration's ADA Policy was in effect.  (Doc. 57 ¶¶ 5, 13.)  Both Risen and Jail Commander Suffle acknowledge that, after the fact, they because aware "that an ADA policy existed and that certain portions were not followed during the relevant time period," including that an ADA coordinator had not been appointed and therefore "no ADA coordinator had looked for 'barriers' to programs and services."  (*Id.* ¶ 14.)

The Jail's ADA policy "instructs employees not to unlawfully discriminate against any person on the basis of a person's disability," and provides for barrier-free access to the facility, programs, and services consistent with reasonable accommodation under the ADA and security requirements.  (Doc. 57 ¶ 24.)  Detention officers learn ADA compliance "in the academy, from their field training [], and from on-the-job training about the foregoing

policies and procedures and ADA standards regarding caring for disabled inmates." (*Id.* ¶ 30.) Plaintiff disputes this statement, asserting that Defendants' own exhibits "indicate that detention officers receive a 2 hour 'overview' of the ADA at the academy" and that "none of the academy training appears to be related to reasonable accommodations for inmates." (Doc. 62 at 4 ¶ 30.) Plaintiff further asserts that "[t]he ADA is not even mentioned in the La Paz County Jail's [] training materials." (Doc. 62 at 4 ¶ 30.) Plaintiff also disputes Defendants' assertion that detention officers "are trained that they may need to assist inmates with physical needs." (Doc. 57 ¶ 32; Doc. 62 at 4 ¶ 32.) Plaintiff contends that La Paz County Jail has "no ADA training curriculum and lesson plans for detention, contract and volunteer personnel" and there is no attendance documentation for all ADA training provided to such personnel between 2012 and 2017. (Doc. 62 at 7 ¶¶ 3, 6.)

## IV. Discussion

### A. Count One: Fourteenth Amendment

Plaintiff states in his Response that he withdraws his Fourteenth Amendment deliberate indifference claim against Defendants Fleming, Ruiz, Redman, Roberts and Jarramillo, and that he asserts this claim only against Defendant Conley. (Doc. 61 at 8 n.1.) Because the only claim brought against Defendants Fleming, Ruiz, Redman, Roberts and Jarramillo is the Fourteenth Amendment claim in Count One, the Court will dismiss these Defendants from the action. The Court will address the claim against Defendant Conley.

#### 1. Legal Standard

The Fourteenth Amendment protects a pre-trial detainee's right to be free from punishment. *Bell v. Wolfish*, 441 U.S. 520, 533 (1979). A pretrial detainee's Fourteenth Amendment claim regarding the conditions of his confinement is evaluated under an objective deliberate indifference standard. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). A detainee must demonstrate that a defendant's acts or omissions were objectively unreasonable and identify objective facts indicating the "challenged governmental action is not rationally related to a legitimate governmental objective or that

1  it is excessive in relation to that [objective]."  *Kingsley v. Hendrickson*, 135 S. Ct. 2466,

2  2473-74 (2015).

3        A condition is punitive if it is "intended to punish," "excessive in relation to its non-

4  punitive purpose," or "employed to achieve objectives that could be accomplished in so

5  many alternative and less harsh conditions."  *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir.

6  2004) (citations omitted).  But if a particular condition or restriction of pre-trial detention

7  is "reasonably related to a legitimate governmental objective, it does not, without more,

8  amount to 'punishment.'"  *Bell*, 441 U.S. at 539.  Legitimate, non-punitive government

9  interests include "ensuring a detainee's presence at trial, maintaining jail security, and

10  effective management of a detention facility."  *Jones*, 393 F.3d at 932 (citing *Hallstrom v.*

11  *City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993)).

12        Thus, to find that a condition of confinement for pre-trial detainees amounts to a

13  constitutional violation under the Fourteenth Amendment, the Court must determine that

14  the condition: "(1) imposes some harm to the pre-trial detainees that significantly exceeds

15  or is independent of the inherent discomforts of confinement; *and* (2) (a) is not reasonably

16  related to a legitimate governmental objective *or* (b) is excessive in relation to the

17  legitimate governmental objective."  *Graves v. Arpaio*, No. CV-77-0479-PHX-NVW, 2008

18  WL 4699770, at *7 (D. Ariz. Oct. 22, 2008) (emphasis in original); *Demery v. Arpaio*, 378

19  F.3d 1020, 1029 (9th Cir. 2004) ("For a particular governmental action to constitute

20  punishment, (1) that action must cause the detainee to suffer some harm or 'disability,' and

21  (2) the purpose of the governmental action must be to punish the detainee").

22        Corrections officials "should be accorded wide-ranging deference in the adoption

23  and execution of policies and practices that in their judgment are needed to preserve

24  internal order and discipline and to maintain institutional security."  *Bell*, 441 U.S. at 547;

25  *Graves*, 2008 WL 4699770, at *6 (in determining whether a particular condition of

26  confinement is "reasonably related to maintaining security and order and operating the

27  institution in a manageable fashion, courts ordinarily should defer to the expert judgment

28  of correction officials in the absence of substantial evidence that indicates officials have

exaggerated their response to these considerations"). But "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary and purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees." *Bell*, 441 U.S. at 539.

### 2. Discussion

Defendants argue that Plaintiff's alleged deprivation of not being able to shower safely was not caused by actions of the individual Defendants. (Doc. 56 at 13.) Defendants assert that Plaintiff was housed in a cell with bottom-bunk accessibility, near medical and Jail staff, and with an intercom for Plaintiff to communicate with the cell tower if he needed assistance. (*Id.*) They further contend that Plaintiff had showered the day before and was aware of the Jail's walk-in shower, rubber mats, and shower stool, but chose not to request assistance with showering and "effectively foreclosed the on-duty Jail staff's ability to assist Plaintiff with showering either by providing him with accommodations to shower in his jail cell (such as a shower chair) or to take him to another location to shower (such as the intake shower)." (*Id.*)

Plaintiff argues that his "evidence shows Conley's actions are directly linked to [P]laintiff's fall," that "Conley was fully aware of Plaintiff's disability because he had to use a wheelchair to move him," and that Conley "disregarded Nurse Bissell's direction to house Plaintiff in a medical cell (with showers with grab bars) and intentionally decided to house Plaintiff in the Juvenile cell with the non-compliant shower." (Doc. 61 at 8.) Plaintiff contends that Conley "aggravated the risk to Plaintiff by providing him with soap and a towel and telling him to take a shower." (*Id.*) This last statement—that Conley told Plaintiff to take a shower—is in Plaintiff's Response brief. Plaintiff does not cite any evidence in the record to support this assertion. *See Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("arguments and statements of counsel are not evidence").

The undisputed evidence in this case shows that Plaintiff was placed in the juvenile cell because the two medical cells were occupied. There is no evidence in the record that

1    Plaintiff's placement in the juvenile cell was intended to punish him.  Plaintiff's proposed
2    alternative – moving one of the detainees out of a medical cell – is not reasonable in the
3    absence of evidence that the other detainee did not need the medical cells.  Nor does
4    Plaintiff dispute that he had the alternative of requesting a reasonable accommodation so
5    he could shower safely, but did not make such a request.

6         Even if Conley had told Plaintiff to take a shower, Plaintiff does not present
7    evidence that Conley told him to shower in the non-accessible cell shower, and Plaintiff
8    does not dispute that after Conley moved him to the juvenile cell he slept for five hours
9    and then decided to shower in his cell without requesting assistance from anyone.

10        Given these facts, the Court cannot conclude that Defendant Conley imposed harm
11   on Plaintiff that significantly exceeded or was independent of the inherent discomforts of
12   confinement, or that Conley action of placing Plaintiff in the juvenile cell was not
13   reasonably related to a legitimate governmental objective or was excessive in relation to
14   the legitimate governmental objective.  *Graves*, 2008 WL 4699770 at *7.  The choice to
15   house Plaintiff in the juvenile cell was reasonably related to the governmental objective of
16   maintaining institutional security while housing Plaintiff as safely and as close to the
17   medical unit as possible.  There is no evidence that housing Plaintiff in the juvenile cell
18   was arbitrary or purposeless.

19        Plaintiff's citation to *Frost v. Agnos*, 152 F.3d 1124 (9th Cir. 1998), does not change
20   the Court's analysis.  In *Frost*, the Ninth Circuit Court of Appeals found a triable issue of
21   fact regarding whether the failure to provide the plaintiff with adequate shower facilities
22   violated the plaintiff's constitutional rights.  152 F.3d at 1129-30 ("slippery floors without
23   protective measures could create a sufficient danger [to a disabled detainee] to warrant
24   relief").  The plaintiff in *Frost* was a pre-trial detainee with a leg cast and crutches who,
25   over a period of months, fell and injured himself several times at the county jail—
26   sometimes while showering in non-accessible showers, sometimes while carrying his food
27   tray, and once when he climbed 48 steps while holding his crutches because two officers
28   refused to carry his crutches.  *Id.* at 1127.  The guards in *Frost* were aware of the plaintiff's

falls, and the plaintiff filed several grievances advising jail officials of the risks he faced. *Id*. at 1129.

Unlike *Frost*, Plaintiff in this case did not have a history of falls and injuries at the Jail of which officials were aware, and there is no evidence they refused to assist him. While the evidence shows that Plaintiff's condition was obvious and officers were aware of some risk, the evidence also shows that they assisted him and made accommodations due to his condition.  They took reasonable measures by housing him in the juvenile cell with the lower bunk near the medical unit, and they provided Plaintiff with adequate shower facilities after intake when they knew he was going to shower.  Plaintiff cannot show that Conley housing him for one night in the juvenile cell with a non-accessible shower, when he had been instructed to ask for assistance, was "more than negligence" or even "reckless disregard."  *Castro*, 833 F.3d at 1071 (to support Fourteenth Amendment claim, a plaintiff must "prove more than negligence but less than subjective intent— something akin to reckless disregard").

The Court will grant summary judgment to Defendant Conley on Plaintiff's Fourteenth Amendment claim in Count One.

### 3. Qualified Immunity

Even if the Court did find a question of fact regarding whether Plaintiff's Fourteenth Amendment rights were violated, Defendant Conley would be entitled to qualified immunity.

### (a) Legal Standard

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby,* 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664, (2012)).  Courts may address either prong first, depending

on the circumstances in the particular case.  *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009).

For a right to be clearly established, there does not have to be a case directly on point, but "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2017)).  A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).  To determine whether qualified immunity applies, the court must first identify the federal or constitutional right at issue; then it must attempt to "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right.  *Id.*  If there is no such case, then the right was not clearly established, and the officer is protected from suit.  *See id.* at 1117-18.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).

**(b)    Discussion**

The relevant question is whether short-term placement of Plaintiff in a non-ADA equipped cell violates clearly established rights.  Plaintiff responds that even before the ADA was adopted, "courts recognized that disabled inmates' 8th [A]mendment rights were violated where disabled inmates were not provided with physical accommodations necessary because of their disabilities, including adequate toilet and shower facilities."  (Doc. 61 at 8.)  Plaintiff again cites *Frost v. Agnos*, which the Court finds inapposite for reasons explained above.  Plaintiff also cites *Casey v. Lewis*, 834 F. Supp. 1569 (D. Ariz. 1993), *LaFaut v. Smith*, 834 F.2d 389, 392-94 (4th Cir. 1987), and *Ruiz v. Estelle*, 503 F.

1   Supp. 1265, 1345 (S.D. Tex. 1980), rev'd in part and aff'd in part, 679 F.2d 1115 (5th Cir.

2   1982), opinion amended, 688 F.2d 266 (5th Cir. 1982).

3         In *Casey*, the district court found that "[d]isabled inmates must be provided with

4   physical accommodations necessary because of their disabilities, including adequate toilet

5   and shower facilities." 834 F. Supp. at1581 (citing *LaFaut*, 834 F.2d at 392-94 and *Ruiz*,

6   503 F. Supp. at 1345). But the court further found that "[t]he duration of confinement in

7   the alleged condition is relevant in determining whether a constitutional violation exists."

8   *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("It is equally plain, however, that

9   the length of confinement cannot be ignored in deciding whether the confinement meets

10  constitutional standards."), and *Hoptowit v. Ray*, 682 F.2d 1237, 1258 (9th Cir. 1982) ("the

11  longer the prisoner is without such benefits, the closer it becomes to being an unwarranted

12  infliction of pain")). *Casey* found that at the time of the filing of the action, 68 prisoners

13  in the Arizona Department of Corrections were confined to wheelchairs, had artificial

14  limbs, or were partially paralyzed. *Id.* at 1582. The Court found that inaccessible

15  bathrooms, showers, and cells resulted in several prisoners falling or being unable to

16  shower, in violation of their constitutional rights. *Id.*

17        In *LaFaut*, the plaintiff was a federal prisoner, paraplegic, and confined to a

18  wheelchair. 834 F.2d at 390. The plaintiff was placed in a "wet room" with no handicap

19  facilities. *Id.* at 392. In particular, the toilet was surrounded by three walls and had no

20  railing. Because the area was too small to allow the plaintiff to transfer himself, he had to

21  lie on the floor, drag his body across it, and pull himself up onto the commode. *Id.* at 392.

22  "[I]t was two months before any significant attempt was made to modify the toilet

23  facilities," and another month passed before the plaintiff was transferred to a room with

24  adequate facilities. *Id.* The Fourth Circuit found that the warden was aware of the problem

25  and there was "no apparent justification for the delay." *Id.* at 393. The court found "that

26  the conditions under which appellant was confined for nearly eight months fell far short of

27  meeting the 'broad and idealistic concepts of dignity, civilized standards, humanity, and

28

decency . . . .' embodied in the Eighth Amendment."  *Id*. at 394 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (other citation omitted)).

In *Ruiz*, a class action, the Texas district court focused primarily on overcrowding in the Texas prisons and its effects on the conditions of confinement.  503 F. Supp. 1265. Plaintiff cites one portion of the decision addressing the care of prisoners with mental disabilities in which the court found that the Texas Department of Corrections "ha[d] taken no steps to obtain alternative care for such inmates."  *Id*. at 1345 ("The fact that unusual accommodations may be necessary, in light of their special needs, to accomplish the provision of minimal conditions of incarceration does not absolve prison officials of their duty toward handicapped inmates.")

Defendants argue that all of the cases cited by Plaintiff "involve circumstances where disabled inmates were not provided any physical accommodations—a fact that undisputedly does not exist in this circumstance because Plaintiff was provided shower accommodations in the short time he was present at the Jail and instructed to ask for any additional assistance."  (Doc. 68 at 7.)  Defendants further contend that none of the cases cited by Plaintiff required an inmate to be placed in a jail cell "with an en-suite accommodating shower."  (*Id*.)

The Court agrees that none of the cases cited by Plaintiff put Defendant Conley on notice that placing Plaintiff for a few hours in a cell without an accessible shower, with instructions and means to call if he needed assistance, violated a federal statutory or constitutional right or that the unlawfulness of his conduct was clearly established at the time.  The cases cited by Plaintiff all relied on the duration of confinement in determining whether there is a constitutional violation.  Here, Plaintiff was in the cell was for a few hours and certain accommodations were made for his condition in the form of a low bunk and placing him away from other detainees.  It would not be clear from the cited cases that the short-term placement in the juvenile cell violated Plaintiff's rights.  Accordingly, Defendant Conley is entitled to qualified immunity and the Court will grant summary judgment to Conley and dismiss him from this action.

**B.     Count Two: Failure to Train**

Plaintiff asserts Count Two against La Paz County and Sheriff Risen.  (Doc. 1 ¶¶ 71-78.)  Plaintiff alleges that Risen failed to train Jail detention officers on how to comply with the ADA and that "[t]he conduct of La Paz County and/or Sheriff Risen was both the cause in fact and the proximate cause of the violation of [Plaintiff's] 14th Amendment rights."  (*Id*. at 9-10.)  Plaintiff sues Risen in his official capacity.[2]

**1.     Legal Standard**

A local government may be held liable under § 1983 for a constitutional violation if that violation occurred as a result of the municipality's official policy or custom.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 94 (1978).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A municipality may also be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick*, 563 U.S. at 60.  To support a *Monell* claim for failure to train under § 1983, a plaintiff must allege facts demonstrating that the local government's failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Connick*, 563 U.S. at 61 (citing *City of Canton*, 489 U.S. at 388).

---

[2] Although Plaintiff initially indicated that he was suing Risen in his individual capacity as well, Plaintiff makes no argument in his Response regarding Risen's liability in his individual capacity.  Moreover, Plaintiff has failed to offer evidence to support an individual-capacity claim showing that Risen "was personally involved in his alleged constitutional deprivation by, for example, acting, or failing to act, in a manner that was deliberately indifferent" to Plaintiff's constitutional rights.  *Olivier v. Baca*, 913 F.3d 852, 858 (9th Cir. 2019) (citation omitted).  Therefore, Plaintiff appears to have abandoned any individual-capacity claim against Risen and the Court will not address this claim.

Deliberate indifference may be shown "if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *City of Canton*, 489 U.S. at 390.  The plaintiff must allege facts to support that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need." *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002).  It is "ordinarily necessary" to allege facts demonstrating a pattern of similar constitutional violations by untrained employees to demonstrate deliberate indifference for purposes of a failure-to-train claim. *Connick*, 563 U.S. at 62.  By showing a pattern of similar violations, a plaintiff can establish that policymakers were on "actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights." *Id.*  Thus, a *Monell* claim generally must be based on more than "a single constitutional deprivation, a random act, or an isolated event." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 671 (9th Cir. 2015).

### 2.    Discussion

To support *Monell* liability, the plaintiff must first allege an underlying constitutional violation. *See Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996).  As the Court previously found, the evidence fails to support a Fourteenth Amendment violation.

Even if the Court found a constitutional violation, the evidence would need to support "[a] pattern of similar constitutional violations by untrained employees," which is "'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).  This requires a plaintiff to show that "policymakers were on actual or constructive notice that a particular omission in their training program causes [] employees to violate citizens' constitutional rights," but chose not to remedy the training program. *Id.* at 61.

1    Defendants argue that Plaintiff has failed to point to any specific deficiency in the
2    County's policies and training that directly caused his constitutional deprivation and there
3    are no facts demonstrating that the County was on notice that its policies were deficient.
4    (Doc. 56 at 19.)  Plaintiff responds that the Jail "appears to have a long standing custom,
5    policy or practice of refusing to comply with the ADA" because no ADA coordinator has
6    been appointed, "none of the Jail's services, policies and practices have ever been evaluated
7    to determine compliance with ADA requirements, and no effort has ever been made to
8    identify and remedy barriers in the jail" (Doc. 61 at 10.)

9    Although Plaintiff's evidence of a failure to fully comply with the ADA is
10   concerning, Plaintiff has not presented any evidence of a pattern of similar constitutional
11   violations, such as falls by qualified individuals with disabilities in non-ADA-compliant
12   showers or facilities.  As such, the record evidence fails to establish that Jail officials were
13   on actual or constructive notice that a particular omission in their training program would
14   cause detention officers to violate a citizen's constitutional rights.

15   A plaintiff may still prove a failure-to-train claim without showing a pattern of
16   constitutional violations where a violation "may be a highly predictable consequence of a
17   failure to equip law enforcement officers with specific tools to handle recurring situations."
18   *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal quotation marks and
19   citation omitted).  In such instances, "failing to train could be so patently obvious that [an
20   entity] could be liable under § 1983 without proof of a pre-existing pattern of violations."
21   *Connick*, 563 U.S. at 63-64.  For example, in *City of Canton*, the Court hypothesized that
22   if a city knows that its police officers will be required to arrest fleeing felons, and the city
23   arms its officers with firearms to accomplish this task, "the need to train officers in the
24   constitutional limitations on the use of deadly force can be said to be 'so obvious,' that
25   failure to do so could properly be characterized as 'deliberate indifference' to constitutional
26   rights."  489 U.S. at 390 n.10.

27   Plaintiff does not address whether this single incident was the "highly predictable
28   consequence of a failure to equip law enforcement officers with specific tools to handle

recurring situations." Plaintiff does argue that it is "beyond question that a practice or policy of refusing [to] comply with the ADA to include seeking out barriers and correcting them, would result in a disabled detainee being denied an accessible shower and a reasonable accommodation." (Doc. 61 at 10.) The evidence, though, does not show a complete refusal to comply with the ADA because the Jail did have two ADA-compliant cells with accessible showers, an ADA-compliant shower in the intake/booking area that Plaintiff used with the assistance of detention officers, and Jail employees did receive some ADA training, just not to the extent Plaintiff believes was necessary.

The facts presented by Plaintiff do not show that constitutional violations were such a predictable consequence that the failure to train employees was an obvious omission. *See Connick*, 563 U.S. at 66-67. Thus, in addition to the fact that Plaintiff has not shown that he was subjected to a constitutional violation, his facts are insufficient to show that La Paz County and Sheriff Risen were on notice that failure to train Jail staff regarding ADA issues may lead to constitutional violations.

For the above reasons, Plaintiff's *Monell* claim against Risen and La Paz County fails, and the Court will grant summary judgment to Defendants as to Count Two.

### C. Count Three: ADA

Plaintiff alleges in Count Three that Defendant La Paz County violated the ADA by either excluding him from participation in or denying him the benefits of the Jail's services, programs, or activities because of his disability. (Doc. 1 at 10 ¶¶ 79-83.)

#### 1. Legal Standard

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" is "any State or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131. The phrase "services, programs, or

activities" applies to the prison setting.  *See Penn. Dep't of Corrs.* v. *Yeskey,* 524 U.S. 206, 210 (1998).

To prevail on a Title II ADA claim, a plaintiff must show that "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017).  The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2). The plaintiff in a Title II case bears the initial burden "of producing evidence that a reasonable accommodation was possible." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).  The burden then shifts to the public entity to show "that the requested accommodation was not reasonable." *Id.*

A plaintiff seeking monetary damages under the ADA "must prove intentional discrimination on the part of the defendant." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).  (citation omitted).  The Ninth Circuit Court of Appeals applies a deliberate indifference standard to determine whether a defendant intentionally discriminated against a plaintiff. *Id.*  Deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that [] likelihood." *Id.* (holding that the deliberate indifference "must be a result of conduct that is more than negligent") (citing *City of Canton*, 489 U.S. at 389, 395); *see also T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 467 (9th Cir. 2015) (a plaintiff seeking monetary damages under the ADA or the Rehabilitation Act "must show that the defendant acted with intent to deny him the benefits of the public program or a reasonable accommodation").

The first element of the deliberate indifference test is satisfied when a plaintiff "has alerted the public entity to his need for accommodation" or where the need for accommodation "is obvious[] or required by statute or regulation."  *Duvall*, 260 F.3d at 1139.  The second element requires "an element of deliberateness" and "must be a result of conduct that is more than negligent[.]"  *Id.* (citations omitted) (noting that a public entity receiving a request for accommodation has a duty to investigate the request and determine "what constitutes a reasonable accommodation").

## 2.      Discussion

Defendants do not dispute that Plaintiff is a qualified individual with a disability.

Defendants argue that Plaintiff was only housed at the Jail for 26 hours, that during that time he took a shower in the booking/intake area with reasonable accommodations, and that there is no evidence that any individual denied Plaintiff any requests for accommodation because he made no requests.  (Doc. 56 at 20-21.)  Defendants argue that the Jail "was not required to make structural changes to the facility to make its programs and services readily accessible to Plaintiff," but was required only "to make reasonable accommodations for Plaintiff, which it did."  (*Id*. at 22, citing *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1219 (9th Cir. 2008).)  Defendants further contend that Plaintiff knew that a shower stool, rubber mats, and a walk-in shower were available, but decided not to ask for any accommodations and took a shower "without even his non-slip shoes," thereby failing to give Jail staff an opportunity to reasonably accommodate his needs.  (*Id*.)

Plaintiff responds that the shower in his cell was not ADA compliant and that Defendants did not accommodate him "by taking even basic precautions such as: placing a stool or chair in the shower, placing a non-slip mat outside of [the] shower, and/or monitoring [Plaintiff] as he showered with staff [sic], providing [Plaintiff] with a cane or walker and/or housing [Plaintiff] in a cell with an ADA-compliant shower."  (Doc. 61 at 11.)  Plaintiff contends that when he told an officer over the intercom that he was going to take a shower, "at that point staff could and should have been alerted to assist [Plaintiff]." (*Id*.)  In response to Defendants' argument that Plaintiff did not request an accommodation,

1  Plaintiff argues that nothing in Title II "remotely suggests that covered entities have the

2  option of being passive in their approach to disabled individuals" and that Title II requires

3  entities to act affirmatively to evaluate their programs and services.  (*Id.* at 12, citing *Pierce*

4  *v. Dist. of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015).)

5        The Supreme Court has found it "quite plausible that the alleged deliberate refusal

6  of prison officials to accommodate [the plaintiff's] disability-related needs in such

7  fundamentals as mobility, hygiene, medical care, and virtually all other prison programs

8  constituted 'exclu[sion] from participation in or . . . deni[al of] the benefits of' the prison's

9  "services, programs, or activities."  *United States v. Georgia,* 546 U.S. 151, 157 (2006)*,*

10  (quoting 42 U.S.C. § 12132 and citing *Yeskey,* 524 U.S. at 210).

11        A reasonable jury would not conclude that by assisting Plaintiff in showering in an

12  ADA-compliant shower in the intake area, and then housing him in a cell for one night

13  without an accessible shower – when Plaintiff knew there was an accessible shower in the

14  intake area and was instructed to ask for assistance if he needed anything – the County

15  excluded Plaintiff from participation in or denied him the benefits of the Jail's services,

16  program, or activities because of his disability.  Moreover, there is no evidence that anyone

17  acted with deliberate indifference toward Plaintiff.  To the contrary, Defendants provided

18  an accessible shower in the Jail, that Plaintiff used during his 26-hour stay.  Accordingly,

19  the Court will grant summary judgment to La Paz County on Plaintiff's Title II ADA claim

20  in Count Three.

21        **D.**    **Count Four: Negligence**

22        Plaintiff alleges that Defendant La Paz County breached its non-delegable duty of

23  care to detainees to protect them from unreasonable risks of harm by failing to

24  appropriately house and monitor Plaintiff and by failing to take appropriate precautions so

25  that plaintiff could safely shower.[3]  (Doc. 1 at 11 ¶¶ 84-88.)

26  _____

27      [3] In addition to addressing the negligence claim against La Paz County, Defendants

28  argue that Plaintiff's negligence claim against the individual officers fails.  (Doc. 56 at 23-26.)  Plaintiff did not assert a negligence claim against the individual officers.  (*See* Doc. 1 at 11.)

### 1.    Legal Standard

To establish a claim for negligence under Arizona law, a plaintiff must prove: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (citation omitted).  Whether a duty exists is a matter of law for the court to decide, and "[t]he other elements, including breach and causation, are factual issues usually decided by the jury." *Id.* (internal citation omitted).

### 2.    Discussion

Defendants argue that Plaintiff has not disclosed any witness or expert "who will opine that Defendants had a duty to house Plaintiff in a cell other than the one he was housed in." (Doc. 56 at 24.)  Defendant defines the duty too narrowly.

It is well established that a duty exists when "the relationship of the parties [is] such that the defendant [is] under an obligation to use some care to avoid or prevent injury to the plaintiff." *Quiroz v. ALCOA, Inc.*, 416 P.3d 824, 838 (Ariz. 2018) (citation omitted). Arizona has recognized that a duty to protect exists in certain special relationships such as guardian-ward and jailer-prisoner. *See, e.g.*, *Wertheim v. Pima Cnty.*, 122 P. 3d 1, 4 (Ariz. Ct. App. 2005); *Minneci v. Pollard*, 565 U.S. 118, 128-29 (2012) (noting that California's tort law regarding a jailor's duty of care to protect prisoners from harm "reflects general principles of tort law present, as far as we can tell, in the law of every State").  Whether a duty of care exists is not a factual matter; it is a legal determination made before specific facts in a case are considered.  *Gipson*, 150 P.3d at 232.  Here, the special relationship of jailer-prisoner gave rise to a duty of care.

Defendants argue that the County took appropriate safety precautions so that Plaintiff could safely shower, and that it was Plaintiff's decision to shower without requesting assistance or to use a shower that could accommodate his disability that caused his injuries.  (Doc. 56 at 25.)  Plaintiff responds that the duty to house him appropriately was breached when Conley disregarded Bissell's housing directions, and when Plaintiff

told Officer Roberts he was going to shower and Roberts did not alert the floor officers or take adequate safety precautions.  (Doc. 61 at 15.)

Although the Court finds it to be a close question, and expects that reasonable jurors may well agree with Defendants' argument, whether the officers breached a duty to Plaintiff and were the cause of his injuries are disputed issues of fact that must be decided by a jury.  Therefore, questions of fact preclude the Court from granting summary judgment to La Paz County on Plaintiff's negligence claim.

Defendants also argue that Plaintiff's theory of liability against La Paz County is premised on vicarious liability, and if the individual Defendants have no liability, then the County is not liable.  (Doc. 56 at 26.)  Plaintiff does not dispute Defendants' assertion that his claim is premised on vicarious liability.  Defendants cite several cases in support of their proposition that Plaintiff cannot maintain a negligence claim based on vicarious liability because the individual defendants have no liability.  (*Wiggs v. City of Phoenix*, 10 P.3d 625, 627 (Ariz. 2000), citing *Torres v. Kennecott Copper Corp.*, 488 P.2d 477 (Ariz. Ct. App. 1971), *Law v. Verde Valley Med. Ctr.*, 170 P.3d 701 (Ariz. Ct. App. 2007), and *Mulhern v. City of Scottsdale*, 799 P.2d 15 (Ariz. Ct. App. 1990)).

In *Torres*, the Arizona appellate court held that "where the master's liability is based solely on the negligent acts of his servant, a judgment in favor of the servant relieves the master of any liability."  488 P.2d 477, 479 (Ariz. Ct. App. 1971).  *Torres* relied on a 1945 Arizona Supreme Court opinion, *DeGraff v. Smith*, that held that a dismissal with prejudice of an individual defendant is a judgment on the merits that carries preclusive effect against the agent's principal.  *See* 157 P.2d 342 (1945).

The second case cited by Defendants, *Law v. Verde Valley Med. Ctr.*, addresses Arizona's Uniform Contribution Among Tortfeasors Act (UCATA), which abrogated joint liability for most tortfeasors, and the appellate court held that UCATA did not change the law regarding vicarious liability under *DeGraff*.  170 P.3d 701, 704 (Ariz. Ct. App. 2007). The Arizona Supreme Court subsequently disavowed the holding in *DeGraff* and held that "a stipulated dismissal with prejudice of an employer's agent does not preclude a party

from asserting a claim against the agent's principal for its own independent negligence," even when the independent negligence claim requires proof of the agent's negligence. *Kopp v. Physician Group of Arizona, Inc*., 421 P.3d 149, 150 (Ariz. 2018).  Therefore, *Torres* and *Law* do not support Defendants.

The last case cited by Defendants held that in order for an employer to be liable for negligent hiring, retention or supervision, the employee must have committed a tort. *Mulhern v. City of Scottsdale*, 799 P.2d 15, 18 (Ariz. Ct. App. 1990).  Plaintiff's negligence claim in this case is not premised on a theory of negligent hiring, retention or supervision. Therefore, *Mulhern* is inapposite.

Based on the above, Defendants have not met their burden of showing that Plaintiff's negligence claim in Count Four against La Paz County fails as a matter of law, and the Court will deny the Motion for Summary Judgment as to this claim.

**E.    Punitive Damages**

The only surviving claim in this action is Plaintiff's state law negligence claim against La Paz County in Count Four, and Arizona law provides that a public entity is not liable for punitive damages.  Ariz. Rev. Stat. § 12-820.04.  Therefore, Plaintiff's request for punitive damages fails.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 56).

(2)    Defendants Fleming, Ruiz, Redman, Roberts and Jaramillo are **dismissed without prejudice** from this action.

(3)    Defendants' Motion for Summary Judgment (Doc. 56) is **granted in part and denied in part** as follows:

(a)    The Motion is **granted** as to Plaintiff's claim against Defendant Conley in Count One, and Conley is **dismissed with prejudice** from this action.

(b)    The Motion is **granted** as to Plaintiff's claim against Defendants Risen and La Paz County in Count Two and Risen is **dismissed with prejudice**.

(c)     The Motion is **granted** as to Plaintiff's claim against Defendant La Paz County in Count Three.

(d)     The Motion is **denied** as to Defendant La Paz County in Count Four.

(4)     This action is referred to Magistrate Judge Michael T. Morrissey to conduct a settlement conference as to Plaintiff's negligence claim in Count Four against Defendant La Paz County.

(5)     Counsel shall jointly call Magistrate Judge Morrissey's chambers at 602-322-7680 within 14 days to schedule a date for the settlement conference.

Dated this 29th day of April, 2020.

David G. Campbell
Senior United States District Judge